Gregory D. Phillips (USBN 4645)
PHILLIPS WINCHESTER
4001 South 700 East, Suite 500
Salt Lake City, Utah 84107
Tel: (801) 935-4932
*gdp@phillipswinchester.com*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>  Plaintiff,<br><br>vs.<br><br>PURE HEALTH RESEARCH, a Virginia business entity; and DOES 1-10,<br><br>  Defendants. | **COMPLAINT**<br><br>**Case No. 2:21-cv-00734-DAO**<br><br>**Judge: Daphne A. Oberg** |

COMES NOW Plaintiff XMission, L.C. ("XMission"), and complains and alleges the following:

PARTIES

1

1. Plaintiff XMission, L.C. is a Utah limited liability company with its principal place of business in Salt Lake City, Utah, and at all relevant times hereto was duly registered and licensed to do business in the State of Utah.

2. Defendant Pure Health Research (hereinafter "Pure") is a Virginia business Virginia, which operates online at agelessbrainformula.com, antiagingsecret.com, getbloodsugarformula.com, getfungusfreenails.com, ketosisformula.com, nailfunguseliminator.com, trybloosugarformula.com, purehealthresearch.com, and likely many others.

3. On information and belief, DOES 1-10 are individuals and companies who act as agents for Defendant in the processing and publishing of email advertisement with the purpose of generating revenue for Defendant.

## JURISDICTION AND VENUE

4. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), for violations of the 15 U.S.C. §7701 *et seq.* (CAN-SPAM Act of 2003), and pursuant to 15 U.S.C. § 7706(g)(1) (original jurisdiction) for cases involving a civil action by an internet access service adversely affected by a violation of 15 U.S.C. §7704(a)(1), 15 U.S.C. §7704(b), or 15 U.S.C. § 7704(d), or a pattern and practice that violates subparagraphs (2), (3), (4), and/or (5) of 15 U.S.C. § 7704(a)

5. This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the claims relate to and arise out of the same course of conduct, and form part of the same case and controversy, as the claims over which this Court has original jurisdiction.

6. This Court has personal jurisdiction over the Defendants because the Defendants directly or through their agents have knowingly taken actions, or failed to act, in manners that have directly caused harm to XMission in Utah, and/or have purposefully availed themselves of the privileges of conducting commercial activity in the forum state, including through contracts, and through the sending of thousands of commercial emails into the state either directly or through their agents. The exercise of jurisdiction is reasonable as Defendants should have known that they would be subject to the jurisdiction and laws of the forum state when they sent, or caused the sending of commercial emails to customers of an email service provider located in Utah, and failed to properly unsubscribe email accounts located in Utah.

7. A substantial part of the unlawful actions by the Defendants occurred in this judicial district. Therefore, venue is proper pursuant to 18 U.S.C. §1391.

## GENERAL ALLEGATIONS

8. XMission was founded in 1993 as Utah's first dial-up Internet Service Provider ("ISP").

9. From its early days as a private, Utah ISP, to its current role as a global business Internet provider, XMission has expanded its technical offerings to include sophisticated cloud hosting, web hosting, email service and hosting, collaboration tools, business VoIP phone service, and high speed internet connectivity solutions including optical Ethernet, copper and fiber.

10. Throughout its history, XMission has also worked with hundreds of Utah's nonprofit organizations by providing free web hosting services, and by sponsoring a variety of community-based events and facilities.

11. XMission is a widely known and well-recognized ISP in Utah.

12. XMission owns all the servers, routers, and switches on its network through which it hosts and provides its Internet access services for its customers.

13. XMission has an expansive network and infrastructure, which it has had to consistently update, upgrade, and augment in order to combat ongoing spam problems.

14. XMission is the sole owner of all its hardware, and has complete and uninhibited access to, and sole physical control over, the hardware.

15. As a legitimate and leading ISP, XMission is a bona fide Internet Access Service ("IAS") as that term is defined under 15 U.S.C. §7702(11) and 47 U.S.C. §231(e)(4).

16. XMission provides Internet access services to both commercial and residential customers.

17. The email accounts hosted and served by XMission include email accounts owned by third-party customers of XMission, email accounts owned by employees and/or customers of XMission's third-party customers, email accounts owned by employees of XMission, and also email accounts owned by XMission itself.

18. For purposes of this Complaint, "spam" is defined as unlawful commercial email.

19. Defendants Pure, either directly or in concert with Does 1-10, operates various web properties, including which appear to offer health supplements and other health related materials.

20. On information and belief, to disseminate the links to its various web properties, Defendants maintain an agency relationships, and/or retain other agents, also called publishers, and manifests assent to those agents/publishers to act on

their behalf and subject to their control, to disseminate the marketing campaigns that Defendants produce in order to generate traffic to its web properties.

21. The agents, identified herein as Does 1-10, operate for pay or other consideration.

22. The agents manifest assent to Defendants and otherwise consent to act on their behalf by disseminating the marketing campaigns that Defendants provide, and generate web traffic to benefit Defendants.

23. Defendants control the content of the marketing campaigns and provide the method for its dissemination to its agents.

24. Through the date of this Complaint, XMission has received at least 7,900 spam emails, sent and/or initiated by Pure and/or its agents/publishers that included links to Pure web properties or that used the web domains as sender domains for the transmission of the emails.

25. Pure and its agents sent the spam emails to the XMission domains in order to generate web traffic and income for Pure.

26. The spam emails adversely affected XMission, and contributed to an overall spam problem suffered by XMission in Utah.

27. Pure is a "sender" of the spam emails as defined in 15 U.S.C. § 7702 and 7706(g)(2), as the emails promote its products, services, and/or websites, and as Pure procured the initiation of the emails.

28. Each of the Defendants is an "initiator" of the spam emails as they either transmitted or procured the transmission of the emails in question as such term is defined in 15 U.S.C. § 7702 and 7706(g)(2).

29. On information and belief, the Defendants individually or acting in concert with each other, sent additional spam emails that XMission has been unable to connect directly with them due to the misleading nature of the information in the emails.

30. Each of the emails is a commercial message and contains commercial content.

31. The emails, and each of them, were received by XMission on its mail servers located in Utah.

32. Throughout its business, XMission has expended significant sums of money in hardware acquisition, maintenance and related expenses to increase capacity to deal with increased spam and related harm, spam filtering expenses, and employee time in dealing with problems caused by its receipt of spam generally.

33. On average, XMission expends hundreds of thousands of dollars per year in dealing with spam related issues and associated employee time, exclusive of attorney fees.

34. The harm XMission continues to suffer, as the result of its collective spam problem, is much more significant than the mere annoyance of having to deal with spam or the process of dealing with spam in the ordinary course of business (i.e., installing a spam filter to flag and discard spam).

35. The harm XMission suffered, and continues to suffer, is manifested in financial expense and burden significant to an ISP; lost employee time; lost profitability; the necessity to purchase and dedicate equipment specifically to process spam that could otherwise be dedicated to providing internet access services; harm to reputation; and customer and email recipient complaints, including over 300 reports of unwanted spam arising from the email at issue in this Complaint.

36. Each of the emails in question violates at least one provision of the CAN-SPAM Act.

## FIRST CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1) – Against Each Defendant**

37. Each of the previous paragraphs is realleged herein.

38. The CAN-SPAM Act makes it unlawful to send email messages that contain, or are accompanied by, materially false or materially misleading Header Information.

39. An email header is materially misleading when it impairs the ability of an Internet access service processing the message on behalf of a recipient to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

40. Header information can be materially false or misleading in a number of ways including: (1) the use of a spoofed sender domain; (2) the use of unregistered Sender Domains in the sending of the emails; (3) the use of generic "from" names that fail to identify any party, coupled with private WHOIS information; (4) the use of Sender Domains, the registration information for which is false or materially incomplete; and (5) the use of Sender Domains registered in violation of registrar policies.

41. At least 132 emails contain header information that contains a Sender Domain the corresponds to someone other than the sender or initiator of the email, and is therefore spoofed.

42. At least 315 emails contain header information that includes an unregistered domain, the access to which was never acquired by the sender, and are therefore false or misleading.

43. At least 3,649 emails contain header information that includes a generic "from" name and is accompanied by private or materially incomplete WHOIS information, and are therefore false or misleading.

44. At least 1,064 emails contain header information that is accompanied by false or materially incomplete WHOIS registration information, and are therefore false or misleading.

45. An email that originated from a sender domain registered with an ICANN compliant domain registrar who maintains an anti-spam policy, also violates Section 7704(a)(1) regardless of whether the email contains a header that is technically accurate.

46. Defendants, either individually or in concert with each other, registered domains with the following ICANN compliant registrars:

    a. eNom, Inc.

    b. Gandi SAS

    c. GoDaddy.com, LLC;

    d. Key Systems GmbH

  e. NameCheap, Inc.;

  f. Namesilo, LLC; and

  g. Register.com Inc.

 47. Each of the foregoing registrars maintain policies that prohibit the use of domains registered with them for spam or bulk email, or unsolicited email.

 48. Each of the registrars require registrants to agree to abide by the terms in order to register the domains.

 49. In registering the domains with the registrars, Defendants either expressly or impliedly agreed to the terms. However, the domains were registered with an intent to use them in a manner that violates the governing terms and where obtained under a false pretense.

 50. Defendants used the domains in question in violation of the terms to send at least 5,969 spam, bulk and/or unsolicited emails. Each email was sent in violations of 15 U.S.C. § 7704(a)(1)(A).

 51. The foregoing accounts for at least 11,129 violations of 15 U.S.C. § 7704(a)(1).

 52. Accordingly, XMission prays for relief in the amount of $100 per violation of 15 U.S.C § 7704(a)(1) pursuant to 15 U.S.C. § 7706(g)(3).

## SECOND CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(2) – Against Each Defendant**

53. Each of the previous paragraphs is realleged herein.

54. Section 7704(a)(2) of the CAN-SPAM Act states, "It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message if such person has actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that a subject heading of the message would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message."

55. At least 7,908 emails contain a subject heading that claims that the promoted products have healing properties, protect against series ailments such as diabetes, liver damage, and other similar claims.

56. On information and belief, none of the Defendants possessed any data, documentation, or substantiation supporting the claims in the subject lines, and the subject lines are designed merely to induce the recipient to open the email under false pretenses.

57. Accordingly, XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(2) pursuant to 15 U.S.C. § 7706(g)(3).

## THIRD CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(4) – Against Each Defendant**

58. Each of the previous paragraphs is realleged herein.

59. The CAN-SPAM Act permits a recipient of email to opt out of receiving commercial emails from any sender.

60. If such a request is made, then it is unlawful for the sender—or anyone acting on their behalf—to send or assist in initiating the transmission of a commercial email to that recipient more than 10 days after the request.

61. XMission's *Terms of Service* allow it to unsubscribe from email traffic for its customers.

62. Upon receipt of email promoting Pure, XMission, acting on behalf of its customers, opted out of any future email from Pure for each recipient email address.

63. Despite its opting-out, Defendants, either directly or through their agents, failed to honor the opt-out request and transmitted at least 2,060 emails to XMission's customers after the 10-day grace period had expired.

64. Accordingly, XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(4) pursuant to 15 U.S.C. § 7706(g)(3).

## FOURTH CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(5) – Against Each Defendant**

13

65. Each of the previous paragraphs is realleged herein.

66. The CAN-SPAM Act requires that every commercial email contain (1) a clear and conspicuous identification that the message is an advertisement or solicitation; (2) a clear and conspicuous notice of the opportunity to opt-out; and (3) a valid physical postal address of the sender. *See* 15 U.S.C. § 7704(a)(5)(A).

67. Many thousands of email fail to contain the content required by Section 7704(a)(5)(A).

68. Many thousands of emails ostensibly contain the required content in remotely hosted images, which violates the statute's requirement that such be provide clearly and conspicuously.

69. XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(5) pursuant to 15 U.S.C. § 7706(g)(3).

## FIFTH CAUSE OF ACTION
## UTAH CONSUMER SALES PRACTICES ACT, UTAH CODE § 13-11-1

70. Each of the previous paragraphs is realleged herein.

71. The emails in question are solicitations and therefore qualify as consumer transactions.

72. The Defendants are in the business of soliciting consumer transactions and qualify as suppliers.

73. It is a deceptive act or practice by a supplier in connection with a consumer transaction, whether such occurs before, during, or after the transaction, for the supplier to indicate that the subject of the transaction has sponsorship and/or performance characteristics that it does not have.

74. Defendants, acting as "suppliers," caused the transmission of at least 7,908 emails that contain subject lines that indicated performance characteristics that the products do not have.

75. XMission customers have assigned the right to pursue claims arising from the receipt of spam emails to XMission.

76. The foregoing resulted in 7,908 consumer transactions that affected XMission customers.

77. XMission seeks damages pursuant to Utah Code § 13-11-19 in the amount of $2,000 per consumer transaction.

## REQUEST FOR RELIEF

Plaintiff respectfully requests the following relief:

A. Entry of judgment for breach of implied contract in an amount to be determined at trial.

B. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1).

C. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(2).

D. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(4).

E. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(5).

F. Entry of judgment in the amount of $2,000 per consumer transaction in violation of Utah Code § 13-11-1.

G. Treble damages pursuant to 15 U.S.C. § 7706(g)(3).

H. Attorneys' fees and costs pursuant to 15 U.S.C. § 7706(g)(4).

I. Pre and post-judgment interest at the highest rate permitted by law.

J. Entry of permanent injunction against each Defendant prohibiting each Defendant from sending or causing to be sent email messages to XMission and its customers.

K. All other relief deemed just in law or equity by this Court.

DATED this 15th day of December, 2021.

PHILLIPS - WINCHESTER
 /s/ Gregory D. Phillips
Gregory D. Phillips
*Attorneys for Plaintiff*

<u>Plaintiff's Address</u>:
51 East 400 South
Suite 200
Salt Lake City, Utah 84111