Gregory D. Phillips (USBN 4645)
*gdp@phillipswinchester.com*
**PHILLIPS WINCHESTER**
4001 South 700 East, Suite 500
Salt Lake City, Utah 84107
Telephone:  (801) 935-4933

Jordan K. Cameron (12051)
 *jcameron@djplaw.com*
**DENTONS DURHAM JONES PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Fax: (801) 375-3865

**Attorneys for Plaintiff XMission, L.C.**

---

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company, | **OPPOSITION TO MOTION TO DISMISS [ECF 5]** |
| Plaintiff, | |
| vs. | Case No. 2:21-cv-00734-TS-DBP |
| PUREHEALTH RESEARCH, | Judge Stewart |
| Defendant. | Magistrate Judge Pead |

Plaintiff XMission, L.C. ("XMission") submits this *Memorandum in Opposition to Motion to Dismiss* [ECF 7] filed by PureHealth Research ("Pure Health" or "Defendant") together with the *Declaration of Peter L. Ashdown* and Exhibits.[1]

---

[1] For convenience of the Court, the Declarations and all Exhibits are marked in consecutive numeric order beginning with P001. Citations to the Declarations and exhibits simply refer to the number designation.

1

## <u>Introduction and Statement of Requested Relief</u>

Jurisdiction over Pure Health is not a close call. Pure Health engages in intentional spamming whereby it intentionally and knowingly directs email advertisements to residents of Utah. Many of those email advertisements arrived on servers hosted by XMission in Utah, and form the basis for XMission's claims against Pure Health. The adverse effect suffered by XMission as the result of the spamming occurred in Utah. Moreover, Pure Health has other significant business relationships in Utah.  On these bases, XMission requests that the Court deny Pure Health's *Motion to Dismiss* (the "Motion").

Pure Health's Motion relies almost exclusively on an analogy to *XMission v. Fluent*, a recent Tenth Circuit case where the Court held personal jurisdiction was improper. *See* Motion at 11 (arguing the claims should be dismissed "for all of the same reasons identified [in *Fluent*]"). However, the facts in *Fluent* are easily distinguishable, and such differences are material to the question of jurisdiction. In short, *Fluent* held that the defendant did not personally send, and had no control over the recipients of, <u>any</u> of the emails that were the subject of the complaint. *See* 955 F.3d at 946. This was largely due to the *sui generis* nature of the defendant's business, which was not selling physical products, but rather collecting consumer data to sell to third-party companies.

Here, Pure Health is primarily in the business of manufacturing and selling its own products, which it markets both directly and through the use of third-party affiliates (five of which are located in Utah). Both categories of marketing emails are the subject of the *Complaint*. More importantly, substantial evidence collected in jurisdictional discovery, largely in the form of Pure Health's own admissions, demonstrates that Pure Health consistently, intentionally, and

systematically targets Utah residents to receive marketing emails. Pure Health knows the recipients are located in Utah because it stores the recipients' physical addresses along with their email addresses. Moreover, there is a litany of evidence showing that Pure Health regularly has purposeful business contacts in Utah, including using a Utah manufacturer for at least one of its products; collecting and paying sales tax to the state of Utah; and engaging Utah-based affiliates who act as Pure Health's agents in marketing. There is no question that Pure Health has expressly aimed its marketing efforts at Utah and/or exploited Utah's market for its benefit, thereby causing harm to XMission.

The second two elements require a showing that XMission's alleged harm arises from or relates to the "expressly aimed" conduct; and that exercise of personal jurisdiction comports with traditional notions of fair play and justice. The "arising from" element is easily met here because Pure Health's conduct directly gives rise to XMission's claims—in other words, XMission's claims, injury, and damages are the result of Pure Health's targeted spam emails. Moreover, the third element is met because there are no overriding concerns, cost-related or otherwise, that would make this Court's exercise of jurisdiction over Pure Health unfair. Thus, this Court should deny the Motion and allow the litigation to proceed.

### Statement of Facts

Pure Health Direct Marketing

1.      Pure Health, directly and on its own behalf, advertises and offers products for sale to consumers, who purchase the products directly from Pure Health. (*See Deposition of Giedrius Cekanskis* ("Cekanskis Depo."), 8:13–9:3; 11:3–5, Exhibit A hereto)

3

2.      Over 90% of traffic to Pure Health's website is generated from Pure Health's own direct advertising. (*See* Cekanskis Depo., 11:7–15.)

3.      As part of such advertising, Pure Health regularly generates and directly sends newsletter emails for the purpose of promoting its products and driving traffic to its websites ("Newsletter Emails"). (*See id.* at 17:3–18.)

4.      The spam emails that Pure Health sends itself are sent from one of the following domains: *purehealthresearch.com*; *purehealthresearchnews.com*; and, *purehealthresearchstore.com*. (*See PureHealth Response to Meet & Confer Issues on Jurisdiction Discovery,* May 11, 2022, Exhibit B, hereto).

5.      While the emails Pure Health sends from these domains are dubbed "newsletters" they have a commercial purpose. (*See* Cekanskis Depo. at 17:3–18.)

6.      Examples of such Newsletter Emails are attached hereto as Exhibit C (Deposition Exhibits 10–13), each of which were sent by Pure Health directly. (*See* Cekanskis Depo. at 17:25–19:24.)

7.      Each of the emails in Exhibit C contains one or more links directing the recipient to Pure Health's website where the recipient could then purchase a good or service. (*See id.* at 14–20:8).

8.      Pure Health sends the Newsletter Emails to marketing targets who have allegedly interacted with Pure Health. (*See id.* at 20:21–21:8.)

9.      During the pre-email interactions, Pure Health gathers information from marketing targets such as name, email address, physical address, and IP Address[2] (*See id*. at 45: 2-9.)

10.      Pure Health maintains information about the marketing targets (including physical addresses) who receive the Newsletter Emails. (*See id.* at 21:9–18; 47:13-24.) In other words, for each email address, Pure Health possesses an associated physical address which it stores in its database software. (*See id*. at 34:4–35:6.)

11.      Pure Health intentionally directs the Newsletter Emails to the marketing targets using the data is has stored in order to generate more sales. (*See id.* at 47:13–24.)

12.      Pure Health admits that through its emails, it is "specifically targeting those consumers in order to generate more sales." (*Id*. at 47:21-24.)

13.      Pure Health also uses third-party email services to send its marketing emails. (*See id.* at 32:24–33:23.)

Pure Health Affiliate Marketing

14.      In addition to directly marketing its products, Pure Health does business with affiliates, including affiliates located in Utah. (*See id.* at 24:25–25:2.)

15.      When Pure Health has promotional information it wants to distribute through affiliates, it provides that information to advertising networks with instructions and guidelines to which affiliate must abide. (*See Declaration of Giedrius Cekanskis* ("Cekanskis Decl.") at ¶ 6., Exhibit D hereto)

---

[2] *See What Does an IP Address Tell You and How It Can Put You at Risk*, Norton, https://us.norton.com/internetsecurity-privacy-what-does-an-ip-address-tell-you.html (last updated April 31, 2021) (explaining that IP addresses show a user's "geolocation," including the city, ZIP code, and/or area code)

16.     For example, Pure Health provides its affiliates with tracking links, email templates, subject lines, "from" names, the body content of the email, and unsubscribe suppression lists/instructions. (*See* Cekanskis Depo., 12:16–13:19.)

17.     The affiliates who disseminate the emails sign a contract obligating them to abide by Pure Health's instructions and guidelines, including the use of content provided by Pure Health. (*See id.*)

18.     Affiliates are not allowed to promote Pure Health products through any mechanism not allowed by Pure Health. (*See id.* at 73:5–12.)

19.     The affiliates are also required to embed Pure Health's affiliate link in any email disseminated, which will redirect consumers to Pure Health's website where the consumer may then complete a purchase of Pure Health's product(s). (*See id.* at 13:20–14:14.)

20.     Pure Health has complete control over the advertising disseminated by its affiliates. (*See id.* at 74:15–22.)

21.     Pure Health vests its affiliates with authority to disseminate offers, which Pure Health honors through completing transaction through its websites. (*See id*.)

22.     Pure Health will never reject a consumer who has accepted an email offer sent by one of Pure Health's agent affiliates. (*See id*. at 81:16-18.)

23.     In addition to generated website traffic and sales of Pure Health's products, the affiliate link allows Pure Health to track the traffic generated by the affiliate who sent the link. (*See id.* at 13:23–25.)

24.     Pure Health also provides affiliates with opt-out links, which affiliates are required to put in the emails they send. (*See id.* at 38:6–18.)

25.     Pure Health collects information for consumers who opt-out of their marketing emails, including IP addresses and dates. (*See id.* at 36:5:7.)

Pure Health Sales into Utah

26.     Approximately 95% of Pure Health's revenue is generated from customers within the United States. (*See id.* at 75:25–76:9.)

27.     Pure Health has had consistent sales to consumer in Utah since the inception of its business. (*See id.* at 49:2–14.)

28.     Pure Health is able to distinguish customers by location based on data it maintains, including physical addresses. (*See id.* at 50:1–10.)

29.     Since 2018, Pure Health has made $1,124,514 in revenue from sales to consumers located in Utah, comprising approximately 1.21% of Pure Health's total revenue, or 1.28% of Pure Health's United States revenue. (*See id.* at 57:5–19; *see also* Exhibit E.)[3]

30.     Such Utah revenue was derived from 7,319 sales Pure Health made to consumers located in Utah. (*See* Cekanskis Depo. at 58:25–59:7.)

31.     None of the revenue Pure Health has derived from Utah was made in any way other than through sales of its products, which it markets primarily through its directed efforts. (*See id.* at 80:12–14.)

32.     Pure Health charges sales tax on products sold to consumers located in Utah. (*See id.* at 62:14–15.)

---

[3] Virginia, Pure Health's home state, accounts for 2.20% of its revenue. Notably, Virginia comprises 2.57% of the population of the United States. (*See Pure Health's Answers and Responses to Second Jurisdictional Discovery Requests*, Response to RPD 17, Exhibit G, hereto.)

33.     Pure Health pays sales taxes to the State of Utah and is registered with Utah's sales tax registry. (*See id.* at 62:16–20; *see also* Tax Registration, <u>Exhibit F</u>, hereto.)

34.     In the first quarter of 2022, Pure Health paid $5,724 in collected sales tax to the Utah State Tax Commission. (*See* Cekanskis Depo. at 64:20–24.)

<u>Pure Health's other Directed Contacts in Utah</u>

35.     Pure Health uses a manufacturer located in Pleasant Grove, Utah for at least one of its products it offers for sale through emails it sends directly and through affiliates. (*See id.* at 67:18–68:6; *see also Pure Health's Responses to Plaintiff's Jurisdiction Discovery Requests*, Response to RPD 9, <u>Exhibit H</u>, hereto.)

36.     Pure Health maintains relationships with at least five affiliate marketers located in Utah. (*See Pure Health's Responses to Plaintiff's Jurisdiction Discovery Requests*, Response to RPD 9.)

37.     Pure Health has paid at least $29,863 to its Utah business contacts since 2020 as part of its business operations, the purpose of which is the generate sales of products, including to consumers in Utah. (*See id*.)

38.     Through Pure Health's efforts, it maintains 59 product subscribers in Utah to whom it continuously sends marketing emails and from whom it continually generates revenue. (*See* Utah Subscriber List, <u>Exhibit I</u>, hereto; *see also* Cekanskis Depo. at 17: 3-18.)

39.     Pure Health maintains "valuable assets of the company" in Utah in the form of its subscribers. (Cekanskis Depo. at 26: 10-20.)

<u>XMission's Receipt of Emails and Adverse Affect</u>

40.     Through the date of this *Opposition*, XMission has received at least 655 emails on its servers sent directly from Pure Health. (Declaration of Peter Ashdown ("Ashdown Decl"), ¶ 12, <u>Exhibit J</u>, hereto).

41.     These emails include subject lines that XMission alleges are false and misleading in violation of the CAN-SPAM Act. (*See id*. at ¶ 13.) Exhibit C includes emails with such subject lines. The emails sent directly from Pure Health also resulted in customer complaints to XMission, and contributed to XMission's spam problem. (*See* Ashdown Decl. at ¶¶ 19, 29-30.)

42.     XMission has received an additional 7,800 emails promoting Pure Health's products, sent by Pure Health's agent affiliates, including those located in Utah. (*Id*. at ¶ 16). These emails also resulted in customer complaints, and contributed to XMission's spam problem. (*Id*. at ¶¶ 19, 30).

43.     Pure Health has records of opt-outs it has received from XMission's customers. (*See Pure Health's Responses to Plaintiff's Jurisdiction Discovery Requests*, Response to RPD 4; *see also* Ashdown Decl. at ¶ 22.)

44.     Despite having received opt-out requests, Pure Health failed and refused to honor those opt-out requests, and continued to send or caused emails to be sent to the opted-out email addresses. Based on the opt-out records Pure Health produced, XMission has identified at least 85 emails sent more than 10 days after opt-out, in violation of the CAN-SPAM Act.  (*See* Ashdown Decl. at ¶ 23.)

45.     XMission's *Terms of Service* allow it to unsubscribe from email traffic for its customers. (*See id*. at ¶ 20.)

46.     Upon receipt of email promoting Pure Health, XMission, acting on behalf of its customers, opted out of any future email from Pure Health for each recipient email address. (*See id*. at ¶ 21.)

47.     XMission's own records indicate at least 2,060 emails received after XMission had taken efforts to opt-out on its customer's behalf pursuant to its agreement with its customers. (*See id*. at ¶ 26.)

<u>**Legal Standard**</u>

To obtain personal jurisdiction over a nonresident defendant, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment. *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995). Accordingly, Utah law governs the exercise of personal jurisdiction over defendants, so long as it satisfies due process. *See id*.; *see also Soma Med. Int'l v. Standard Chartered Bank*¸ 196 F.3d 1292, 1295 (10th Cir. 1999).

In addressing a motion to dismiss for lack of personal jurisdiction, Plaintiff's factual allegations must be accepted as true and all reasonable inferences to be drawn from those facts must be made in the light most favorable to plaintiff. *See Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 2, 201 P.3d 944. Where the defendant challenges jurisdiction through Declaration or other evidence, the plaintiff is entitled to rebut the evidence through its own filings, and need only make a prima facie showing of personal jurisdiction based on that evidence. *See OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1091–92 (10th Cir. 1998). Moreover, "any disputes in the documentary evidence are resolved in [plaintiff's] favor." *Neways, Inc. v.*

*McCausland*, 950 P.2d 420, 422, 424 (Utah 1997) (citation omitted); *see also Hafen v. Strebeck*, 338 F. Supp. 2d 1257, 1260 (D. Utah 2004).

Although the plaintiff bears the initial burden to establish personal jurisdiction, "where, as here, the issue is raised early on in litigation, based on pleadings (with attachments) and affidavits, that burden can be met by a prima facie showing." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011); *see also Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Factual disputes must be resolved in the plaintiff's favor. *Neways*, 950 P.2d at 422.

## Argument

Because the Utah long-arm statute is coterminous with the exercise of jurisdiction under the U.S. Constitution, due process governs the inquiry. However, it is important to note that Utah's long-arm statute was enacted "to ensure maximum protection to citizens of this state, [and] should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment . . . ." Utah Code § 78B-3-201(3); *see also Starways, Inc. v. Curry,* 1999 UT 50, ¶ 7, 980 P.2d 204 (quoting *Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106, 1110 (Utah 1985)).

Under a due process analysis, "defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1070 (10th Cir. 2008) (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)). Personal jurisdiction may be either general or specific. *See id.* In this case, Plaintiff relies on the specific personal jurisdiction framework, which requires three elements: first, Defendant has "purposefully directed" its activities at Utah;

second, XMission's injuries "arise out of" or "relate to" those activities; and third, exercising personal jurisdiction over Defendant is consistent with "traditional notions of fair play and substantial justice." *See Hood v. Am. Auto Care, LLC*, 21 F. 4th 1216, 1220–21 (10th Cir. 2021) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) and *Bristol-Meyers Squibb Co. v. Sup. Ct. of Cal.*, 137 S. Ct. 1773 (2017)).

As discussed further below, due to Pure Health's numerous intentionally-created contacts with the state of Utah, the exercise of specific personal jurisdiction over Pure Health is well warranted in this case. In fact, it is not even a close call. The exercise of jurisdiction comports with due process. Moreover, if the Court finds that the foregoing elements are satisfied based on Pure Health's conduct in directly targeting and exploiting the Utah market, it may exercise personal jurisdiction as to the *Complaint* as a whole. *See XMission L.C. v. Click Sales*, No. 2:17-cv-287, 2019 WL 1574810, *5 (D. Utah April 11, 2019) (holding that "[e]ven if the bulk of [the defendant's] claims relate to emails from third-party affiliates, the existence of some claims arising out of [the plaintiff's] intentionally sent emails is sufficient for this court to exercise jurisdiction").

I.     PURE HEALTH PURPOSEFULLY DIRECTED ACTIVITY AT UTAH UNDER THE CALDER EFFECTS AND/OR THE STREAM OF COMMERCE FRAMEWORKS.

There is not one conclusive test that courts employ to determine whether a party has purposefully directed activity toward a forum state. In fact, the Tenth Circuit has identified at least three viable frameworks, each of which it is held satisfy the purposeful direction element. *See Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d 895, 905 (10th Cir. 2017). Below, Plaintiff demonstrates that Pure Health has purposefully directed its commercial,

business activities at Utah under two frameworks: (A) the "harmful effects" test; and (B) the

"market exploitation" test. *See id.*

> A. **Pure Health Purposefully Directed its Activities at Utah Residents Under the Harmful Effects Test.**

The "harmful effects" test often employed in the Tenth Circuit is based on *Calder v.*

*Jones*, 465 U.S. 783 (1984). *See Shrader*, 633 F.3d at 1239. Under this test, purposeful direction

is established if three showings are made: (i) the defendant commits an "intentional action"; (ii)

that is "expressly aimed at the forum state"; (iii) with harmful effects in the forum state. *See*

*Dudnikov*, 514 F.3d at 1072. As demonstrated below, each of these elements is met in this case.

> i.   Primal Health's conduct is expressly aimed at Utah[4].

Pure Health's primary argument against jurisdiction is that it does not knowingly aim any

of its business or marketing activities toward Utah residents. (*See generally* Motion at 11). This

argument is belied by abundant evidence in this case. Specifically, Pure Health admits that it

maintains a database of consumer information that connects consumer email addresses with their

physical location. (*See* Facts 9–10). Pure Health also admits that it intentionally creates

marketing emails for the purpose of directing them to the recipients for whom it possesses such

information. (*See* Facts 5, 11). Further, Pure Health intentionally directs the marketing emails to

the recipients in question who Pure Health knows are located in Utah. (*See* Fact 11). Pure Health

sends the emails for the purpose of driving traffic to its websites and selling products from its

websites to recipients in Utah (*See* Facts 11–12). Finally, Pure Health intentionally sells millions

of dollars worth of products to Utah consumers. (*See* Fact 29).

---

[4] Where Defendant's Motion relies almost exclusively on analogizing its business to Fluent's as described in *XMission v. Fluent*, 955 F.3d 833 (10th Cir. 2020), XMission's analysis focuses on factors distinguishing this case from Fluent.

The facts presented by this case are not of first impression to the District of Utah. In *Click Sales*, the defendant operated an online marketplace that facilitated and processed transactions between the buyers visiting the website and the sellers offering their products on the website. *See* 2019 WL 1574810 at *1. To drive traffic to its website, the defendant employed an affiliate marketing program whereby third-party affiliates would email links directing recipients back to the defendant's website. *See id.* at *1–2. As part of its marketing efforts, Click Sales directed emails promoting digital products and knew, or should have known, that it was directing emails to residents of Utah. *See id.* at *2, 4–5. This Court held that exercising personal jurisdiction was proper because the case "involves email sent directly from [the defendant]." *See id.* at 8–9.

In stark contrast to *Fluent*, the evidence in this case demonstrates that Pure Health knowingly, regularly, and directly sends marketing emails (including at least the commercial Newsletter Emails) to recipients it knows to be located in Utah. (*See* Facts 8–13). There can be no genuine dispute that Pure Health knows it is sending these marketing emails to Utah residents because the recipients' email addresses are stored alongside the recipients' physical addresses in Pure Health's data management system. (*See* Fact 10). This is a not a case where a defendant is indiscriminately and blindly sending emails to a large list of email addresses with no additional information regarding the recipient or their location. Instead, Pure Health strategically emails marketing targets that it knows reside in Utah, for the purpose of generating more website traffic and sales from Utah.

As Pure Health concedes, the Tenth Circuit in *Fluent* held that exercising personal jurisdiction over a defendant based on an email is proper where the plaintiff demonstrates the defendant "otherwise knew where the recipient was located . . . ." 955 F.3d at 845; *see also*

*Shrader v. Biddinger*, 633 F.3d 1235, 1247–48 (10th Cir. 2011) (noting that phone calls, faxes, and letters "have been found sufficient to support specific personal jurisdiction," but that a distinguishing factor of emails is that email addresses "do not reveal anything about the geographic location of the addresses").

Pure Health does not send emails indiscriminately and without other identifying information. For each email it sends, it knows the physical location of the recipients, and intentionally directs its emails there. (*See* Fact 8–13). The knowledge Pure Health possesses is the exact type of knowledge the Tenth Circuit specifically contemplated in *Shrader* that fulfills the "expressly aimed" element for personal jurisdiction.

Moreover, as in *Click Sales*, Pure Health's sending emails (either directly or through affiliates) post opt-out gives rise to jurisdiction. In *Click Sales*, this Court stated:

> even if ClickBank contends that it sends ClickBank University emails indiscriminately to every state in the nation and therefore no state in particular, such an email sent to a Utah customer after that Utah customer has requested no further such emails is "directed" at Utah because ClickBank is already on notice not to send the email to that customer in Utah. Accordingly, the court finds that ClickBank purposefully directed these subsequent emails to Utah and such emails can form the basis for XMission's CAN-SPAM causes of action against ClickBank in Utah.

2019 WL 1574810 at *4.

Here, based on Pure Health's own records, it continued to send emails to Utah recipients after the recipients opted-out. (*See* Facts 43–44). Further, as in *Click Sales*, "XMission has an automatic unsubscribe system that notified [Pure Health] of its customers' desires to unsubscribe to future [Pure Health] emails. (*See* Facts 45–47). That XMission has records of receiving thousands of additional Pure Health emails sent to Utah after receiving XMission's opt-out

attempts is sufficient for the Court to conclude that such spam emails are directed at Utah because Pure Health is already on notice not to send the emails to that customer in Utah.[5]

There is no genuine dispute that Pure Health engaged in conduct expressly aimed at Utah.

### ii. Pure Health's conduct is intentional.

The requirement that Pure Health acted intentionally is easily satisfied, and more importantly not disputed in Pure Health's Motion. For purposes of this element, XMission need only demonstrate that the activities giving rise to personal jurisdiction—*i.e.*, the marketing emails sent to Utah customers by or on behalf of Pure Health—were intentional. *See Newsome v. Gallacher*, 722 F.3d 1257, 1268 (10th Cir. 2013) (holding that this element "require[d] little discussion" where there was no evidence that "defendants acted unintentionally when they took" the actions complained of).

Pure Health does not argue that the emails it and its affiliates have sent to Utah customers were sent accidentally, nor can it. As discussed above, Pure Health has testified that it intentionally sends marketing emails (*see* Fact 1–3), necessarily including individuals located in Utah. (*See* Facts 8–13). Additionally, Pure Health has testified that it directly hires and instructs its affiliates to send marketing emails on its behalf. (*See* Facts 14–15).

There is no genuine dispute that Pure Health acted intentionally in sending the marketing emails in question.

### iii. Pure Health's activities have resulted in harm and injury in Utah.

The harmful effects element of this test is not materially distinguishable from the "arising from" requirement as described in *Old Republic*, 877 F.3d at 904, and *Burger King Corp. v.*

---

[5] In fact, Pure Health admits that it records IP Addresses when it receives opt-out requests which necessarily identifies the general physical location (*i.e.*, in Utah) of the recipient. (*See* Fact 25).

*Rudzewicz*, 471 U.S. 462, 472 (1985). In an effort to reduce redundancy, this analysis is set forth in Section II, herein, which demonstrates that this element is satisfied. Moreover, it is important to note that, similar to the intentional conduct element, Pure Health's Motion does not dispute that the conduct alleged in the Complaint resulted in harm to XMission and its customers.

  B.  ALTERNATIVELY, THE PURPOSEFUL DIRECTION ELEMENT IS SATISFIED
      UNDER THE MARKET EXPLOITATION TEST.

  In *Old Republic*, the Tenth Circuit held that a defendant's "continuous and deliberate exploitation of the forum state market may also satisfy the purposeful direction requirement." 877 F.3d at 905–06 (internal citations and quotations omitted). The Court referenced the United States Supreme Court's holding in *Keeton v. Hustler Magazine, Inc.*, which found purposeful direction was satisfied where the defendant had "regular monthly sales of thousands of [its products]" in the forum state. *Id.* at 906 (citing 465 U.S. 770, 774 (1984)). The Tenth Circuit identified several factors that would suggest market exploitation, including "high sales volume and large customer base and revenues [in the forum state]"; and "ads targeting the forum state." *Old Republic*, 877 F.3d at 915.

  The evidence here demonstrates that Pure Health has a disproportionately large sales volume in Utah, and that it targets Utah consumers for its direct marketing. First, Pure Health admits that it has derived consistent sales and revenue from consumers based in Utah since the start of its business. (*See* Fact 27). Specifically, in the past four years, Pure Health has made $1,124,514 from sales to Utah consumers, comprising approximately 1.21% of its total revenue, and 1.28% of its United States revenue. (*See* Fact 29). Although at first glance this appears to be a relatively small percentage, it is actually disproportionately large when considering Utah is home to only .97% of the United States' population. (*See* U.S. State Populations by Rank,

17

Infoplease, *https://www.infoplease.com/us/states/state-population-by-rank* (last accessed June 28, 2022)). Simply, if Pure Health indiscriminately sold its products evenly across the United States, one would expect Utah to account for around .97% of all sales. That Pure Health earns 1.28% of its United States' revenue from sales to Utah indicates that Pure Health's Utah business activity exceeds expectations on a per capita basis by almost 33%. Notably, Pure Health's home base of Virginia which accounts for 2.57% of the U.S. population, only accounts for 2.2% of its sales revenue. Pure Health does more business in Utah on a per capita basis that in its own home state.

Second, and as already discussed in the previous section, Pure Health directly markets to customers it knows are Utah residents. (*See* Facts 8–13). In addition, it utilizes a manufacturer in Utah for at least one of its products (*See* Facts 35); it pays sales taxes to Utah (*See* Fact 37); and it uses a handful of marketing affiliates it knows are based in Utah, and thus likely to market to Utah citizens (*See* Fact 36). Through these endeavors, Pure Health has paid $29,863 into the state of Utah as part of its business operations in since 2020. (*See* Fact 22).

Third, through its marketing efforts, Pure Health has secured subscribers in Utah to whom it continuously sends marketing emails and from whom it continually generates revenue. (*See* Fact 38–39).

Market exploitation does not require that a defendant's revenue solely, or even mostly, is derived from the forum state. It only requires evidence sufficient to demonstrate that Pure Health has "continuously and deliberately exploited the [Utah] market," so that it could reasonably anticipate being subject to its jurisdiction. The evidence sufficiently establishes Pure Health's continuous and deliberate exploitation of the forum state through its thousands of sales into Utah,

its intentionally marketing into Utah, its maintenance of subscriber relationship in Utah, and its

maintenance of other business contracts in Utah.

II.     THE SECOND ELEMENT OF PERSONAL JURISDICTION IS SATISFIED
        BECAUSE THE LAWSUIT ARISES OUT OF AND/OR RELATES TO PURE
        HEALTH'S ACTIVITIES IN UTAH.

The second element for personal jurisdiction requires that there be some connection

between the defendant's action and the plaintiff's injury that is not too remote. *See Burger King*,

471 U.S. at 472. In other words, XMision's injuries must "arise out of or relate to [Defendant's]

activities." *Pro Axess, Inc. v. Orlux Dist. Inc.*, 428 F.3d 1270, 1278–79 (10th Cir. 2005) (citing

*Burger King*, 471 U.S. at 472). The Tenth Circuit has employed two separate tests to analyze

causation: the "but-for" and proximate causation tests. *See Dudnikov*, 514 F.3d at 1078 (holding

that the "but-for" test inquires whether "any event in the causal chain leading to the plaintiff's

injury is specifically related to the claim," while the proximate cause test examines "whether any

of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim"). In

this case, both tests are satisfied.

Pure Health's contacts with Utah in this case include: Pure Health's transmission of

thousands of unlawful spam emails to XMission's email servers in Utah, including Pure Health's

deliberate targeting of thousands of unlawful emails to Utah residents; Pure Health's sending of

email (either directly or through affiliates) after Utah consumers opted-out; Pure Health's

engaging affiliates in Utah to both manufacture products for sale and market said products; and,

Pure Health's selling its products to thousands of consumers in Utah. Each of these activities

comprises Pure Health's business model, which ties it to Utah.

But for these activities, the email marketing component of which nearly exclusively forms the basis of XMission's claims, XMission would not have been injured and its claims would not have arisen. Moreover, these contacts, individually and collectively, are relevant and fundamental to XMission's claims.

The United States Supreme court recently offered additional clarity on what a defendant needs—or more importantly, does not need—to show to satisfy the second element for personal jurisdiction. *See Ford Motor Company v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021). Specifically, it held that there does not need to be a causal link between the activities giving rise to jurisdiction and the plaintiff's injuries alleged. *Id.* at 1026. Rather, there need only be a relationship between the activity and the harm alleged.

In *Ford*, the Supreme Court found a more remote relationship to satisfy the second element for personal jurisdiction. There, the minimum contacts supporting personal jurisdiction were based, as XMission contends here, on the defendant's exploitation of the forum market. *See Ford*, 141 S. Ct. at 1028. However, the injuries the plaintiff's alleged were based on malfunctioning of vehicles the defendant sold outside of the forum state. *Id.* at 1029. The Supreme Court held that the defendant's targeting marketing of the vehicles to the forum's citizens was sufficiently related to the claim (*i.e.*, the malfunctioning of such vehicles), such to support jurisdiction. *Id.* In other words, the injury did not arise from Ford's marketing in the forum state, nor did it arise from Ford's sale of the vehicle in the forum state. However, Ford's activity (*i.e.*, promoting its products to create consumer demand) in the forum state, was enough of a nexus to support jurisdiction when a consumer was injured by a Ford vehicle.

Here, the connection is much more direct. Pure Health's business model is to generate demand for, and then sell its products. As part of the business model, Pure Health takes full advantage of the State of Utah by utilizing Utah companies to create products, utilizing Utah companies to market products, selling products to Utah consumers, and more importantly, directly targeting Utah citizens with marketing emails advertising its products. The emails at issue are the direct cause of the harm alleged by XMission in the *Complaint*. Such actions are sufficient to demonstrate causation, but even if XMission's injury were not the result of Pure Health's directed actions in Utah, Pure Health's other deliberate conduct in Utah, the overall purpose of which is the create market demand for its products, bear a strong relationship to XMission's claims, and therefore satisfy this element of personal jurisdiction.

III.   **EXERCISING PERSONAL JURISDICTION OVER PURE HEALTH IS CONSISTENT WITH TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE.**

As noted above, the final inquiry is whether "the exercise of personal jurisdiction would 'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1080 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Courts generally consider a number of non-exclusive factors in connection with this inquiry, including:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states [or foreign nations] in furthering fundamental social policies.

*Id.*; *see also Kindig It Design*, 157 F. Supp. 3d 1167, 1180 (D. Utah 2016). Once minimum contacts are established, "it is incumbent on defendants to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Pro*

*Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005)). Defendant has presented no such case.

Any burden for Pure Health to litigate this case in Utah is minimal and is limited to the fact that Pure Health is an out-of-state entity. However, as the court determined in *Kindig It Design*, "[i]n the modern world of air transportation and digital communication, the court has no difficulty in finding that litigating in Utah will not create so substantial a burden on [the defendant] as to violate Due Process." *Kindig It Design*, 157 F. Supp. 3d at 1180. Regarding evidence, this is a case about spam email, and every single one of the spam emails at issue is presently located on XMission's servers in Utah.

The second factor also shows that due process is not violated because Utah has a significant interest in protecting its citizens against receiving spam emails and false advertising such as is at issue in this case.

Factors three, four, and five support the exercise of jurisdiction because XMission has a strong interest in obtaining relief in this location, where it operates and where it is suffering acute injury. The interstate judicial system likewise has an interest in efficiently resolving this dispute and thereby promoting justice, which can be accomplished in this forum without delay.

Exercising personal jurisdiction over Pure Health will not offend traditional notions of fair play and substantial justice, particularly because minimum contacts have been established, and Pure Health's extensive contact with Utah shows it reasonably should expect to be haled into court in this jurisdiction. Accordingly, the Court should deny the motion to dismiss for lack of jurisdiction.

## Conclusion

Based on the foregoing, the Court should deny Defendant's *Motion to Dismiss*.

DATED this 13th day of July, 2022.

PHILLIPS WINCHESTER

/s/ Gregory D. Phillips
Gregory D. Phillips
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I certify that on this 13th day of July, 2022, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system and/or email which sent notification of such filing to the following:

/s/ Kim Altamirano
Kim Altamirano