IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| XMISSION LC, a Utah company,<br><br>Plaintiff,<br><br>v.<br><br>PUREHEALTH RESEARCH, a Virginia business entity; and DOES 1-10,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS<br><br>Case No. 2:21-CV-734-TS-DBP<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant PureHealth Research's ("PureHealth") Motion to Dismiss for Lack of Personal Jurisdiction. For the reasons stated herein, the Court will grant the Motion.

I. BACKGROUND

Plaintiff XMission, L.C. is a Utah company that provides internet access services to customers in Utah, and elsewhere.[1] PureHealth is a Wyoming limited liability company in the business of developing, marketing, and selling health products to consumers throughout the United States.[2] PureHealth's principal place of business is in Virginia.[3] PureHealth markets its products through emails to consumers.[4] Some of these emails, which PureHealth calls

---

[1] Docket No. 2 ¶¶ 8–9.

[2] Docket No. 19-4 ¶¶ 3–4.

[3] *Id.* ¶ 3.

[4] *Id.* ¶¶ 5–6, 8.

"newsletter" emails, are sent directly by PureHealth,[5] while other marketing emails are sent by third-party "affiliates."[6]

PureHealth does not interact with these affiliates directly and does not see the emails that they send or know to whom they are sent.[7] Though PureHealth hires a "very small percentage" of affiliates directly,[8] PureHealth generally contracts with advertising networks to market its products, and these networks then engage affiliates to create and send PureHealth marketing emails.[9] PureHealth instructs advertising networks that marketing emails sent by affiliates should only be sent to consumers who have opted into those emails and not subsequently opted out.[10] PureHealth claims that it "expects that all promotional emails will be generated and sent in a manner that is compliant with all applicable federal and state laws."[11]

PureHealth's records contain physical address information for customers who receive the "newsletter" emails that Defendant sends directly.[12] A newsletter recipient's physical address information is associated with his or her email address in PureHealth's records.[13] PureHealth sends newsletter emails only to customers who have purchased a PureHealth product and opted in to receiving these emails by providing their email address[14] and not subsequently opted out.[15]

---

[5] *Id.* ¶ 8.
[6] *Id.* ¶¶ 5–6.
[7] *Id.* ¶¶ 5–7, 9.
[8] Docket No. 19-1 at 10:11–12.
[9] Docket No. 19-4 ¶¶ 5–7, 9.
[10] *Id.* ¶ 9.
[11] *Id.* ¶ 7.
[12] *See* Docket No. 19-1, 20:21–21:18; 47:13–25.
[13] *See id.* at 45:2–9.
[14] *See id.* at 45:2–48:23.
[15] Docket No. 19-4 ¶ 8.

PureHealth alleges that all requests to opt out from either newsletter emails or affiliate emails are received by PureHealth,[16] and PureHealth provides its advertising networks access to a list of email addresses that have opted out of affiliate emails.[17] PureHealth also regularly tests opt-out links included in newsletter and affiliate emails to ensure that the links function properly.[18] However, PureHealth does not control whether affiliates honor unsubscribe requests.[19]

According to the Complaint, "XMission has received at least 7,900 spam emails"[20] on its Utah-based email servers[21] "sent and/or initiated by [Defendant] and/or its agents/publishers"[22] in violation of 15 U.S.C. § 7701 *et seq.* (CAN-SPAM Act)[23] and Utah Code § 13-11-1 (Utah Consumer Sales Practices Act).[24] XMission alleges that the emails violated the CAN-SPAM Act because they all contained materially misleading subject headings,[25] while some also contained "materially false or materially misleading Header Information,"[26] and/or were sent more than ten business days after XMission unsubscribed the recipient email addresses from PureHealth marketing emails.[27] XMission's Complaint alleges that "[u]pon receipt of email promoting

---

[16] Docket No. 19-1 at 35:15–36:19.

[17] Docket No. 19-4 ¶ 7.

[18] Docket No. 19-1 at 36:20–38:25.

[19] *See* Docket No. 19-4 ¶ 7.

[20] Docket No. 2 ¶ 24.

[21] *Id.* ¶ 31.

[22] *Id.* ¶ 24.

[23] *Id.* ¶ 36.

[24] *Id.* ¶¶ 70–77.

[25] *Id.* ¶¶ 54–57.

[26] *Id.* ¶¶ 38–51.

[27] *Id.* ¶¶ 58–63.

Pure[Health], XMission, acting on behalf of its customers, opted out of any future email from Pure[Health] for each recipient email address."[28] The Complaint further alleges that PureHealth, "either directly or through [its] agents, failed to honor the opt-out request and transmitted at least 2,060 emails to XMission's customers after the 10-day grace period had expired."[29] Finally, Plaintiff claims that all the emails in question violated the Utah Consumer Sales Practices Act because they falsely indicated that certain PureHealth products have certain "performance characteristics."[30] XMission claims that these emails "contributed to an overall spam problem suffered by XMission in Utah"[31] that represents monetary, administrative, and reputational costs for the company.[32]

## II. STANDARD OF REVIEW

The plaintiff bears the burden of showing that the court has personal jurisdiction over each defendant.[33] Where, as here, there has been no evidentiary hearing,[34] that burden is a light one; the plaintiff need only make a *prima facie* showing of personal jurisdiction.[35] In evaluating the plaintiff's showing, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits,

---

[28] *Id.* ¶ 62.

[29] *Id.* ¶ 63.

[30] *Id.* ¶¶ 70–76.

[31] *Id.* ¶ 26.

[32] *Id.* ¶¶ 32–35.

[33] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069–70 (10th Cir. 2008)).

[34] Neither party has moved for an evidentiary hearing so the court may decide the motion on the pleadings (with attachments) and affidavits. *Id.*; Fed. R. Civ. P. 12(i).

[35] *Shrader*, 633 F.3d at 1239; *see Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[36]

In determining whether this court has personal jurisdiction over Defendant, the court must determine (1) whether Utah law authorizes jurisdiction and (2) whether the exercise of jurisdiction comports with due process.[37] Utah's long-arm statute authorizes jurisdiction over non-resident defendants "to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution."[38] Therefore, the personal jurisdiction analysis collapses into one inquiry: whether exercising jurisdiction comports with due process.[39]

"[T]o exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'"[40] Such "minimum contacts" may give rise to either general or specific personal jurisdiction.[41] "General jurisdiction, as its name implies, extends to any and all claims brought against a defendant."[42] "A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State."[43] Plaintiff does not claim that there is general jurisdiction.[44]

---

[36] *Wenz*, 55 F.3d at 1505 (internal quotation marks and citations omitted).

[37] *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

[38] Utah Code Ann. § 78B-3-201(3).

[39] *ClearOne Comm'n, Inc. v. Bowers*, 643 F.3d 735, 763 (10th Cir. 2011) (explaining that the personal jurisdiction inquiry under the Utah long-arm statute is a due process one).

[40] *Dudnikov*, 514 F.3d at 1070 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

[41] *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 613 (10th Cir. 2012).

[42] *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (internal quotation marks and citations omitted).

[43] *Id.*

[44] Docket No. 19 at 11.

Specific jurisdiction, by contrast, applies when "in exchange for 'benefitting' from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts."[45] The defendant must have taken some action "by which it purposefully avails itself of the privilege of conducting activities within the forum State" and the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum."[46]

### III.  DISCUSSION

There are at least three frameworks for determining whether a defendant's activities satisfy purposeful direction.[47] XMission argues that this case satisfies two of them: the "harmful effects" framework and the "market exploitation" framework.[48]

Under the "harmful effects" test, the purposeful direction requirement is met if the defendant took "(a) an intentional action that was (b) expressly aimed at the forum state with (c) knowledge that the brunt of the injury would be felt in the forum state."[49] XMission has not provided sufficient facts to conclude that PureHealth "expressly aimed" conduct toward the State of Utah.

Analyzing whether mass emails in another case met this requirement, the Tenth Circuit stated:

---

[45] *Dudnikov*, 514 F.3d at 1078 (citing *Trujillo v. Williams*, 465 F.3d 1210, 1218 n.7 (10th Cir. 2006)).

[46] *Ford Motor Co.*, 141 S. Ct. at 1024–25 (internal quotation marks and citations omitted).

[47] *See Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 905 (10th Cir. 2017) (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 472–73 (1985)).

[48] Docket No. 19 at 12–13.

[49] *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 841 (10th Cir. 2020) (quoting *Old Republic*, 877 F.3d at 907).

>Although email is directed to particular recipients, email addresses typically do not reveal anything about the geographic location of the addressee. Thus, if the plaintiff does not show that the defendant otherwise knew where the recipient was located, the email itself does not demonstrate purposeful direction of the message to the forum state, even if that happens to be where the recipient lived.[50]

XMission has not shown that PureHealth knew any affiliate emails would be sent to residents in Utah. Though PureHealth stores address information alongside associated email addresses for recipients of the newsletter emails, it does not know to whom affiliate emails are sent. The affiliates, rather than PureHealth, decide to whom the affiliate emails are sent. XMission claims that "Pure Health has complete control over the advertising disseminated by its affiliates."[51] However, this claim is based on an affiliate contract provision requiring that PureHealth approve any advertising that affiliates disseminate on search engines.[52] PureHealth does not have the same requirement for the marketing emails sent by affiliates giving rise to the claims at issue.[53] PureHealth "provides the advertising networks with some details, guidelines and sample creatives for the emails," but it does not know or decide to whom the affiliates send marketing emails.[54] PureHealth does not have contact with the affiliates.[55] Thus, even if affiliates act subject to PureHealth's control and on its behalf in disseminating search engine advertisements, there is an insufficient basis to conclude that the affiliates so act in sending emails marketing PureHealth products.

---

[50] *Shrader*, 633 F.3d at 1247–48.

[51] Docket No. 19 at 6.

[52] *See id.*; Docket No. 19-1 at 70:22–71:6, 74:9–18.

[53] Docket No. 19-1 at 74:23–75:3.

[54] Docket No 19-4 ¶ 6.

[55] *Id.*

In a similar case, the defendant, which XMission also sued for spam emails allegedly violating the CAN-SPAM Act,[56] contracted with an outside company to send marketing emails on its behalf throughout the country but did not know the recipients' geographical locations.[57] The Tenth Circuit found these facts insufficient to establish that the defendant purposefully directed the emails to Utah.[58]

XMission argues that PureHealth was aware that some of the affiliate emails were sent to Utah because affiliate emails continued to be sent to Utah residents after the residents unsubscribed from receiving such emails. XMission has provided evidence that some affiliate emails went to Utah residents more than ten business days after recipients unsubscribed, and that requests to unsubscribe from affiliate emails provide PureHealth with the requester's IP address,[59] which usually reveals the requester's city and ZIP code. However, these facts do not support jurisdiction because PureHealth does not control or know when affiliates send subsequent marketing emails to unsubscribed email addresses.[60] PureHealth provides affiliates with a list of unsubscribed email addresses and asks that affiliates refrain from sending marketing emails to people who have opted out of them. There is no evidence to show that PureHealth sent any affiliate emails. The fact that affiliates may have sent emails after being made aware of an unsubscribe request is insufficient to establish that PureHealth purposefully directed activities to Utah because PureHealth does not know or control where the affiliate emails at issue were sent.

---

[56] *See Fluent*, 955 F.3d at 837.

[57] *Id.* at 837–38.

[58] *Id.* at 845–46.

[59] *See* Docket No. 19-1, 36:5–7.

[60] Docket No. 5 at 3–4.

Plaintiff points to *XMission, L.C. v. Click Sales, Inc.*,[61] to support its jurisdictional argument. There, the court found that the defendant purposefully directed emails to the forum state where there was evidence that the defendant had received unsubscribe notices from customers in Utah and yet proceeded to directly send emails to customers who had opted-out.[62] This case is distinguishable from *Click Sales* because, as discussed above, XMission has not shown that PureHealth, as opposed to its affiliates, sent any emails after receiving unsubscribe requests. This fact makes this case more analogous to *Fluent*.

XMission has also failed to establish that PureHealth expressly aimed the newsletter emails to Utah. It is undisputed that PureHealth stores physical address information for newsletter email recipients and thereby constructively knows that some of these emails are going to Utah residents. However, PureHealth sends these emails only to customers who have purchased a PureHealth product and thereby opted into receiving PureHealth newsletter emails.

Even if PureHealth's newsletter emails were sufficient to establish purposeful direction, XMission has not alleged facts that support the contention that the newsletter emails sent to Utah residents caused or are related to its causes of action. The only claim XMission specifically ties to the newsletter emails is that the emails contained "false or misleading" subject headings. XMission conclusively claims that the subject headings were false or misleading because they indicated that PureHealth products had certain "performance characteristics" that they did not actually possess. However, XMission does not provide any specific factual allegations or

---

[61] No. 2:17-CV-1287-DAK, 2019 WL 1574810 (D. Utah Apr. 11, 2019).

[62] *Id.* at *5 ("XMission has alleged that ClickBank directly sent emails to Utah and that some of XMission's CAN-SPAM claims arise out of those emails. The alleged failure to unsubscribe the email recipient from future emails allegedly caused harm to XMission and its customers in Utah.").

evidence to support this claim. XMission has, therefore, not alleged sufficient facts to support that the newsletter emails specifically caused the harms that XMission alleges.

XMission has also failed to show purposeful direction under the "market exploitation" framework. Under this framework, "a defendant purposefully directs activities into the forum State if it continuously and deliberately exploits the forum State's market."[63] The Tenth Circuit has explained that "[f]actors suggesting purposeful direction based on forum state market exploitation include: (a) high sales volume and large customer base and revenues, and (b) extensive nationwide advertising or ads targeting the forum state."[64] XMission asserts that PureHealth has satisfied this framework through marketing emails sent to Utah residents; making revenue from Utah throughout the company's history, including $1,124,514 in the last four years; spending $29,863 for business purposes in Utah since 2020; and having five Utah-based advertising affiliates.[65] XMission also claims that PureHealth exploits Utah's market because a Utah company manufactures one of PureHealth's products.[66] Without more, these allegations do not satisfy the market exploitation test.

XMission alleges that PureHealth has made over $1 million in revenue from Utah in the last four years and PureHealth's revenue is disproportionally high in comparison to Utah's population. In *Fluent*, the Tenth Circuit held that XMission could not satisfy the market exploitation test where they failed to identify the source of an even greater amount of revenue made by the defendant.[67] Specifically, the Tenth Circuit found it significant that XMission had

---

[63] *Fluent*, 955 F.3d at 849.

[64] *Old Republic,* 877 F.3d at 915.

[65] Docket No. 19 at 17–19.

[66] *Id.* at 18.

[67] *Fluent*, 955 F.3d at 849–50.

not shown that the source of revenue had any relation to the alleged unlawful activities under the CAN-SMAP Act.[68] The same failure is present here. While XMission has alleged a certain amount of PureHealth's revenue comes from Utah, XMission has not alleged that such revenue bears any relation to PureHealth's alleged violation of the CAN-SPAM Act. Accordingly, as in *Fluent*, Utah-generated revenue, without more, cannot support jurisdiction.

XMission's allegations that PureHealth directs advertisements to Utah residents is also insufficient to establish jurisdiction where, as discussed above, XMission has not shown PureHealth made an effort to target Utah residents specifically. Likewise, XMission's allegation that PureHealth may know that five of its advertising affiliates are located in Utah is insufficient to establish jurisdiction where these affiliates are hired by advertising networks, not by PureHealth itself, and there is no evidence that the advertising networks, let alone PureHealth, selected these affiliates because they are based in Utah.

Finally, PureHealth's contracting with a Utah company to manufacture one product is too attenuated to support personal jurisdiction, especially considering that no evidence indicates that PureHealth chose this manufacturer because of its Utah location. Even if PureHealth had selected this manufacturer because of its location, the Supreme Court has held that a contract with a business in the forum state is not by itself sufficient to support personal jurisdiction.[69] Though PureHealth does business with and advertises to Utah customers, it does not exploit Utah's market to the extent required by the market exploitation test. PureHealth has, therefore, failed to demonstrate purposeful availment.

---

[68] *Id.*

[69] *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S. F. Cnty.,* 137 S. Ct. 1773, 1783 (2017).

Even assuming the above-described business contacts were sufficient to convince the Court that PureHealth had purposefully availed itself of the privilege of conducting business in Utah under the market exploitation test, XMission has not drawn a sufficient nexus to these business contacts and the claims at issue. XMission points to *Ford Motor Company v. Montana Eighth Judicial District Court*, a Supreme Court case holding that, to satisfy the "arising out of" requirement for personal jurisdiction, a defendant's activities need only "relate to"—they need not cause—the plaintiff's injury.[70] The Court held that the defendant's activities in the forum states, which included extensively advertising vehicles and selling them at dozens of dealerships, were sufficiently related to the Plaintiffs' injuries suffered in car crashes caused by defects in those vehicles to support specific jurisdiction.[71] The Court reasoned that "Ford had systematically served a market in [the forum states] for the very vehicles that the plaintiffs allege[d] malfunctioned and injured them in those States."[72]

The nexus between PureHealth's Utah contacts and the injuries XMission alleges is significantly weaker than the nexus that satisfied the "arising out of" requirement in *Ford*. Unlike in *Ford*, where the defendant extensively advertised its vehicles in the forum states and the vehicles it advertised injured the plaintiffs, such a nexus is not present here. XMission's claims arise out of allegedly harmful email spamming activities of affiliate marketing companies not directly hired by PureHealth and point only to attenuated business relationships and revenues, with no clear relation to the alleged harmful emails. XMission has not provided sufficient facts to convince the Court that the alleged injuries arise out of PureHealth's minimal

---

[70] *See Ford Motor Co.*, 141 S. Ct. at 1026.

[71] *Id.* at 1029.

[72] *Id.* at 1028.

Utah contacts. As such, the Court concludes that XMission has failed to make a prima facie showing that the Court can exercise specific jurisdiction over PureHealth.

### III.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion to Dismiss (Docket No. 5) is GRANTED.

DATED this 6th day of December, 2022.

BY THE COURT:

Ted Stewart
United States District Judge